FIRST NATIONAL SUPERMARKETS, INC., Appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellee, et al.

[Cite as *First Natl. Supermarkets, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1994), 104 Ohio App.3d 289.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 66454.

Decided Dec. 6, 1994.

290

*Benesch, Friedlander, Coplan & Aronoff, Edward Kancler* and *Eric Larson Zalud*, for appellant.

*Kohrman, Jackson & Krantz, Byron S. Krantz, Joshua R. Cohen* and *Daniel E. Anker; Bingham, Dana & Gould* and *Joseph Kociubes*, for appellee.

HARPER, Judge.

Plaintiff-appellant, First National Supermarkets, Inc., appeals from the granting of summary judgment in favor of defendant-appellant, Merrill Lynch, Pierce, Fenner & Smith, Inc., by the Court of Common Pleas of Cuyahoga County. Appellant asserts that genuine issues of fact remain for litigation and that, therefore, the trial court erred in its ruling that the doctrine of *res judicata* barred its claims for declaratory judgment, indemnity and fraud. A careful review of the record compels affirmance.

## I. The Merger

On August 12, 1985, First National Supermarkets, Inc. ("First National"), a publicly owned company, notified its stockholders of a September 12, 1985 meeting. The purpose of the meeting was to vote upon the proposed merger of FNS, Inc. ("FNS"), a newly formed, privately held company which is a wholly owned subsidiary of FNS Holding Company, Inc. ("Holdings"), into First National. For each share of common stock of First National owned, the shareholder was to be compensated in the amount of $24.25 in cash under the terms of the Agreement and Plan of Merger. First National, with offices located in Ohio, and FNS are Massachusetts corporations, whereas Holdings is an Ohio corporation.

The August 12, 1985 notice furthermore provided that if a shareholder was not satisfied with the $24.25 per share compensation, Massachusetts law entitled the shareholder to dissent from the merger. The shareholder thereby preserved his or her right to file appraisal proceedings to recover the "fair cash value" of the shares owned in lieu of the price offered by First National.

As of August 8, 1985, Jeffrey D. Chokel allegedly owned twenty-eight thousand shares of First National stock in his investment account with Merrill Lynch,

Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). The shares were held in a "street name" to facilitate buying and selling rather than being listed in Chokel's name. Regarding Chokel's First National stock on August 8, 1985, Merrill Lynch in actuality held record title to one hundred shares directly, and 16,897 shares through its nominee, Philadelphia Depositary Trust Company ("Philadep").[1]

Merrill Lynch issued a revocable proxy to Chokel on August 27, 1985 which authorized him to vote twenty-eight thousand shares of stock designated as registered to Philadep. Chokel decided to vote against the proposed merger in his belief that the $24.25 was not a fair price for his shares. Merrill Lynch notified First National of Chokel's decision, at his request, in a letter dated September 10, 1985. The letter contained Chokel's intention to demand separate payment for twenty-eight thousand shares of stock registered in the name of Philadep if the merger was consummated.

A second letter dated September 12, 1985 was hand delivered to Robert Sullivan, Vice President, General Counsel and Secretary of First National, at the meeting held on that date. Chokel was in attendance at the meeting. The letter informed Sullivan that Chokel objected to the merger and would seek separate payment for his shares if the merger was successful. Chokel then presented his proxy, voting twenty-eight thousand shares against the merger. The votes went unchallenged by First National.

Chokel was notified by letter dated September 17, 1985, that the merger was effective as of 3:59 p.m. on September 13, 1985. The merger was approved by 90.4 percent of the outstanding shares of First National's stock. As a result, First National became a wholly owned subsidiary of Holdings.

Chokel forwarded a letter dated September 27, 1985 to First National in which he demanded payment for his shares in the amount of $40 per share. Merrill Lynch posted a similar letter to First National on October 3, 1985, demanding fair payment of $40 per each of Chokel's twenty-eight thousand shares.

## II. The Massachusetts Action

On February 4, 1986, Chokel commenced an action against First National in the Suffolk Superior Court, Commonwealth of Massachusetts, case No. 81173. He sought a statutory appraisal of the value of his shares pursuant to Massachusetts law.

First National filed a motion for summary judgment in which it initially referred to the following admission of Chokel:

---

1. See Part II, The Massachusetts Action, *infra*.

" 'Due to clerical error that was not disclosed to plaintiff, however, on September 18, 1985 [the brokerage house, Merrill Lynch, Pierce, Fenner & Smith, Inc.] tendered 28,000 First National Shares. * * * Immediately thereafter Merrill acquired 16,897 First National Shares and partially restored plaintiff's holdings.' "

The record reveals that though Merrill Lynch knew of Chokel's dissent from the merger, it sent him a letter dated September 30, 1985 advising him that his shares were to be redeemed at the merger price of $24.25. Chokel's account statement for the period of August 31, 1985 to September 27, 1985 reflected that twenty-eight thousand shares were "redeemed" and "exchange tender" for $679,000 in cash. These entries were subsequently reversed, and his account statement for the period of September 28, 1985 to October 25, 1985 contained entries which reestablished his ownership of twenty-eight thousand shares of First National stock.

The "clerical error" occurred when Merrill Lynch first obtained twenty-eight thousand First National shares from Philadep when it learned that Chokel dissented from the merger. Merrill Lynch meant to hold these shares until the disposition of Chokel's yet to be filed appraisal action. It would then either sell the shares to First National for $24.25 or their higher "fair cash value" should the Massachusetts court rule in Chokel's favor.

Merrill Lynch, however, accidentally returned the twenty-eight thousand shares to Philadep. Philadep in turn submitted the shares to First National's stock clearing agent for the purpose of having them re-registered in Philadep's name.[2] Notwithstanding this purpose, the agent redeemed the shares.

Merrill Lynch requested that Philadep return twenty-eight thousand shares of First National still held by it when it learned of the accidental redemption of the twenty-eight thousand shares which were to be held for Chokel. Philadep only had 16,897 shares in its vault at this time.

Merrill Lynch accepted the 16,897 shares on behalf of Chokel and kept them during the course of the Massachusetts action. According to the affidavit of Victor Gibbs, a section manager in the exchange unit of the transfer and exchange department of Merrill Lynch at the time, Merrill Lynch created a reserve account to hold $269,247 received from Philadep to cover the proceeds from the inadvertent redemption of Chokel's shares.

Gibbs's affidavit furthermore provided that Merrill Lynch planned to remit the funds to Chokel following the resolution of the appraisal action. It also intended to remit additional monies to Chokel in order to assure that the amount he

---

2. This and subsequent information is drawn from depositions filed in the Massachusetts action; the parties herein stipulated to the admissibility of deposition testimony taken as part of the Massachusetts action.

received equalled the amount he would have received had the original twenty-eight thousand shares been available for appraisal.

First National focused upon the accidental return of Chokel's twenty-eight thousand shares, and the inadvertent redemption of them in its motion for summary judgment, referred to *supra*, filed in the Massachusetts action. It argued that the "clerical error" was fatal to Chokel's appraisal action. First National asserted that appraisals could only proceed if shareholders "owned" shares prior to the merger, identified themselves and their shares as dissenting from the proposed merger, demanded payment with respect to their shares after the merger, and submitted their share certificates for redemption after the completion of the appraisal action. See Massachusetts General Laws, Chapter 156B, Sections 86 to 98 ("G.L. c. 156B"). Therefore, since Chokel's twenty-eight thousand shares were redeemed prior to the commencement of the appraisal action, First National reasoned that summary judgment was appropriate because Chokel could not satisfy the statutory scheme. The Massachusetts court denied First National's motion for summary judgment, and proceeded to trial on Chokel's appraisal action.

The "threshold" defense regarding redemption was reiterated in the opening statement of First National's counsel at trial. It was also addressed during Chokel's cross-examination and the direct examination of First National's officers.

The Massachusetts court entered its judgment on July 26, 1993 in favor of Chokel. Pertinent portions of the judgment entry read:

*"Without assigning any culpability to the conduct of any of the several individuals or departments at Merrill Lynch who were responsible for the processing of Mr. Chokel's 28,000 shares before and after the merger,* this Court finds that a certain amount of confusion did ensue. * * *

*"For purposes of the present action this Court ignores whatever intermediary transactions may have occurred in the processing of the Chokel shares for which Merrill Lynch was responsible.* What is determinative is that taking into account all the shares that had been redeemed, whether intentionally or inadvertently, Merrill Lynch finally held only 16,997 shares of the Company for Mr. Chokel. (Exhibit 42). Of these, as of the August 8, 1985 record date, 16,897 shares were registered to Philadep, Merrill Lynch's nominee, with the remaining 100 shares registered directly to Merrill Lynch. The present proceeding concerns the valuation of only these 16,997 shares. Merrill Lynch has agreed to make Mr. Chokel whole for the other 11,003 shares originally in his Merrill Lynch account. * * * " (Emphasis added.)

The Massachusetts court thereafter concluded that Chokel complied with G.L. c. 156B, Section 86, and was thus entitled to a judicial determination of the value of his 16,897 shares. Specifically, the Massachusetts court found (1) though Chokel only held beneficial title to the shares, his September 12, 1985 letter satisfied the notice requirement of G.L. c. 156B, Section 86 since " '[n]otice by a stockholder, whether legal or beneficial title, is sufficient to meet the statutory prerequisite.' *Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 552 [492 N.E.2d 1122] (1986)"; (2) it did not have to reach the issue of whether Chokel's proxy was revoked by Merrill Lynch's subsequent issuance of proxies since First National did not challenge the proxy when he presented it at the September 12, 1985 meeting, G.L. c. 156B, Section 41 and First National did not challenge Chokel's testimony at trial that he voted his twenty-eight thousand shares against the merger. The court thereafter determined that the "fair cash value" of each share of First National stock was $29.78.

### III. The Ohio Action

On March 3, 1992, First National filed a complaint in the Court of Common Pleas of Cuyahoga County against defendants, Merrill Lynch, Adam Shoesler (an agent and employee of Merrill Lynch), and Chokel.[3] It set forth three causes of action therein—declaratory judgment, indemnification and fraud.

Regarding the declaratory judgment claim, First National asserted in part:

"15. * * * [the August 12, 1985 notice] constituted a written offer for redemption of shares by and between First National and Chokel. First National believes that the act of Merrill Lynch, on or about September 18, 1985, of tendering the 28,000 shares on behalf of Chokel, constituted a valid, binding acceptance of the [notice's] terms * * *, and that *the redemption therefore completed the transaction.* * * * First National had paid $679,000 to Merrill Lynch's agent. Merrill Lynch had deposited the shares involved for the benefit of Chokel, and *at that point in time, there was [sic], as a matter of fact and law, no further legal obligations owed by First National to Chokel or Merrill Lynch.*

"16. First National further believes that the subsequent proxies delivered to it by Merrill Lynch dated September 4, 1985, September 9, 1985 and September 11, 1985 revoked the proxy Merrill Lynch gave to Chokel on August 27, 1985 and that by voting the underlying shares in favor of the merger Merrill Lynch has caused Chokel to lose any appraisal rights he may have had.

"17. First National therefore seeks a declaration of the rights, status and legal relations of the parties, and to declare that Merrill Lynch's conduct

---

**3.** First National voluntarily dismissed Shoesler and Chokel from the action on October 8, 1993.

constituted a valid and binding agreement *as agent* for Chokel as it relates to First National, and that *as between said parties the transaction was completed on or about September 18, 1985,* and that all 28,000 shares were therefore redeemed as a matter of fact, as a matter of contract law, and as a matter of general law *and* that further, *by its conduct with respect to its proxies, Merrill Lynch has abrogated any rights Chokel may have had to obtain appraisal of his shares.*" (Emphasis added.)

First National's claim for fraud was premised upon Merrill Lynch's "conscious and intentional concealment of the redemption of shares." It submitted that in reliance upon Merrill Lynch's representations, it paid $679,000 for the shares, thereby incurring damages from the amount paid, and in legal fees, costs of experts and other out-of-court expenses in the Massachusetts action.

Finally, pertaining to its claim for indemnification, First National posited that the wrongful conduct of Merrill Lynch required that it be held responsible for "all costs, expenses, damages, and other monetary award to which First National may be found liable in the Massachusetts litigation."

Both First National and Merrill Lynch filed motions for summary judgment on August 20, 1993 and August 23, 1993, respectively. First National's motion was based upon the basic principles of contract law, *i.e.,* Merrill Lynch entered into a contract with it when it accepted the redemption proposal by presenting twenty-eight thousand shares and receiving the shares' cash value in return. Thus, First National argued that full performance entitled it to judgment on its three claims. Merrill Lynch on the other hand argued that *res judicata* barred First National's claim for declaratory judgment via the Massachusetts action, and First National was incapable of proving the requisite elements of fraud. The trial court granted Merrill Lynch's motion without opinion on October 13, 1993.

This appeal followed with appellant claiming as error:

"1. The trial court erred by applying the doctrine of *res judicata* to First National's count for declaratory relief.

"2. The trial court erred by applying the doctrine of *res judicata* to First National's indemnity claim.

"3. The trial court erred by applying the doctrine of *res judicata* to First National's fraud claim."

All of First National's assignments of error address the trial court's reliance upon the doctrine of *res judicata* in summarily granting judgment in favor of Merrill Lynch. This court will thus simultaneously review them.

 The granting of summary judgment is only appropriate if there is no genuine issue as to any material fact, and reasonable minds can come to but one

conclusion which is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 201, 24 OBR 426, 428, 494 N.E.2d 1101, 1103; Civ.R. 56(C). An order granting summary judgment will, therefore, only be upheld where the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law when construing the evidence most strongly in favor of the nonmoving party. *Johnson v. New London* (1988), 36 Ohio St.3d 60, 521 N.E.2d 793; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471, 364 N.E.2d 267, 273.

Summary judgment is a procedural device which is used to terminate litigation and, therefore, must be awarded with caution with all doubts resolved in favor of the nonmoving party. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 333, 587 N.E.2d 825, 831; see, also, *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 359, 604 N.E.2d 138, 140. However, it "forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099, citing *Celotex v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

Section 1, Article IV of the United States Constitution deals with the doctrine of full faith and credit and provides that:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

The full faith and credit doctrine as set forth has been codified in Section 1738, Title 28, U.S.Code.

Both the Supreme Court of the United States and the Supreme Court of Ohio have established that the doctrine of full faith and credit requires the state of Ohio to give "full faith and credit" to a final judgment or legal proceeding as rendered in any sister state. See *Wyatt v. Wyatt* (1992), 65 Ohio St.3d 268, 602 N.E.2d 1166. The doctrine further requires that the state of Ohio examine the *effect* of the foreign judgment in light of the law of the foreign state and provide the same *effect* in Ohio courts.

"The judgment for specific performance was rendered in a Texas state court, and we are required by the federal Constitution to give that judgment 'full faith and credit.' U.S. Constitution, Art. IV, Sec. 1. We must examine the *res judicata* effect of that judgment under Texas law and give it that same effect in our courts. *Titus v. Wallick* (1938), 306 U.S. 282 [59 S.Ct. 557, 83 L.Ed. 653]; *Miller v. Rock [Bock] Laundry Machine Co.* (1980), 64 Ohio St.2d 265 [18 O.O.3d

455, 416 N.E.2d 620]. If the claim merges with the judgment under Texas law, we must accept that the same result exists here. *Milwaukee County v. M.E. White Co.* (1935), 296 U.S. 268 [56 S.Ct. 229, 80 L.Ed. 220]; Restatement, *Conflict of Law,* Sec. 450, comments f, g." *William Neundorfer & Co. v. Lash* (Feb. 10, 1983), Cuyahoga App. No. 44768, unreported, 1983 WL 5772. See, also, *Fid. Union Life Ins. Co. v. Canfield* (1982), 7 Ohio App.3d 229, 7 OBR 291, 454 N.E.2d 1353; *California Union Ins. Co. v. Therm–O–Disc* (Jan. 21, 1993), Cuyahoga App. Nos. 61589, 61630, unreported, 1993 WL 12181.

▮ In Massachusetts, the doctrine of collateral estoppel precludes relitigation of issues which were determined in a previous action between the parties or those in privity with the parties. See *Sena v. Commw.* (1994), 417 Mass. 250, 629 N.E.2d 986; *Massachusetts Prop. Ins. Underwriting Assn. v. Norrington* (1985), 395 Mass. 751, 481 N.E.2d 1364. The doctrine precludes issues which were actually litigated in the first action, *Aetna Cas. & Sur. Co. v. Niziolek* (1985), 395 Mass. 737, 481 N.E.2d 1356, and determined by a "final judgment on the merits." *Massachusetts Prop. Ins. Underwriting Assn.* See *Sena; Commonwealth v. Scala* (1980), 380 Mass. 500, 404 N.E.2d 83; Restatement of the Law 2d, Judgments (1982), Section 27. Issue preclusion is intended to promote judicial economy and protect soundness of judgments. See *In re Adoption of Frederick* (1989), 405 Mass. 1, 537 N.E.2d 1208.

▮ In the present action, First National's request for declaratory judgment mimics its defense in the Massachusetts action. First National argues that Merrill Lynch's accidental redemption of twenty-eight thousand shares held on behalf of Chokel abrogated Chokel's right to an appraisal. Since the Massachusetts court proceeded with the appraisal of First National stock held by Chokel, it obviously found that those rights were not abrogated by Merrill Lynch's conduct. First National also argues that Chokel lost his right to an appraisal because his proxy was revoked by proxies issued subsequently by Merrill Lynch. The Massachusetts court also reviewed this argument and concluded:

" * * * 'A proxy purporting to be executed by or on behalf of a stockholder shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.' G.L. c. 156B, [section] 41. Mr. Chokel testified that his proxy was not challenged prior to the vote and that he voted his 28,000 shares against the merger. The company [First National] introduced no evidence to controvert this testimony. Having satisfied the statutory prerequisites of G.L. c. 156B, [section] 86, Mr. Chokel is entitled to a judicial determination of the value of his shares."

Applying the foregoing Massachusetts law governing issue preclusion, this court finds that the trial court properly granted summary judgment in favor of

Merrill Lynch on First National's claim for declaratory judgment. The Massachusetts court determined the "fair cash value" of Chokel's shares; it could not have done so had it accepted First National's abrogation and revoked proxy arguments. First National's arguments in the present appeal were thus addressed, reviewed, and resolved by the Massachusetts court, and were contained in that court's "final judgment." Judicial economy and the principle of soundness of judgments precludes First National from attacking Chokel's right to appraisal of his First National stock in the instant action. *Sena; Massachusetts Property Ins. Underwriting Assn.; Frederick.*

First National also claimed below that it was entitled to indemnification from Merrill Lynch with regard to the Massachusetts action. We are thus once again compelled to give full faith and credit to the Massachusetts court's judgment in reviewing this claim, *Wyatt,* and examine the effect of the judgment in light of Massachusetts law, *William Neundorfer & Co.*

■ Indemnification in the state of Massachusetts permits someone who is without fault, but compelled by operation of law to defend against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss, including reasonable attorney fees. See *Elias v. Unisys Corp.* (1991), 410 Mass. 479, 573 N.E.2d 946; compare *Convention Ctr. Inn v. Dow Chem. Co.* (1990), 70 Ohio App.3d 243, 590 N.E.2d 898; *Allstate Ins. Co. v. U.S. Assoc. Realty, Inc.* (1983), 11 Ohio App.3d 242, 11 OBR 368, 464 N.E.2d 169 (common-law indemnification in Ohio is defined as the right of a secondarily liable party to recover from the primarily liable party all expenditures paid to a third party as a result of a violation of common-law duties).

■ A basic understanding of indemnification law in Massachusetts is that in order for it to be applicable there must be a party who is found to be a wrongdoer. Logically, therefore, there must be a wrongful act for which a party is responsible.

■ The Massachusetts action was limited to the determination of the "fair cash value" of Chokel's First National stock. The trial court determined that Chokel was entitled to an appraisal of his shares in accordance with Massachusetts law. The Massachusetts court's final decision was solely with regard to that value. The court chose to ignore the accidental redemption of twenty-eight thousand shares, and did not apportion any fault to either First National or Merrill Lynch with regard to any activity. Under these circumstances, the Massachusetts action did not reveal a wrongdoer which permits indemnification. The trial court thus properly granted summary judgment in favor of Merrill Lynch as to this claim. *Elias.*

First National's final argument on appeal is that the trial court erred in applying the doctrine of *res judicata* to its three causes of action. However, Merrill Lynch argued in its motion for summary judgment that First National could not establish the element of causation under its claim for fraud. As stated *supra*, the Massachusetts court did not address Merrill Lynch's conduct with regard to the accidental redemption of shares. Since the trial court herein granted Merrill Lynch's motion without opinion, we are compelled to address this argument.

The elements necessary to prove fraud are:

(1) a representation or, where there is a duty to disclose, concealment of a fact;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred;

(4) with the intent of misleading another into relying upon it;

(5) justifiable reliance upon the representation or concealment; and

(6) a resulting injury proximately caused by the reliance. *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709.

In its motion for summary judgment, First National described Merrill Lynch's fraudulent activity as follows:

"1. Six years of undisputed concealment of the fact that Chokel did not have 28,000 shares of First National stock, and indeed, that the Chokel Shares had all been redeemed;

"2. Knowledge of the falsity by Merrill employees in New York and Cleveland, up to the level of at least district manager;

"3. Intent to mislead Chokel and other parties, including First National, that Chokel had 28,000 shares, when he did not;

"4. Years of reliance by First National on these misrepresentations by Merrill, in First National's assessment and prosecution of the Massachusetts litigation; and

"5. Resulting injury to First National via payment of attorney fees, interest, damages in the Massachusetts case and other economic loss."

First National's fraud claim is basically premised upon Merrill Lynch's misrepresentation that Chokel possessed twenty-eight thousand shares of First National stock when he was not in possession of those shares. As repeated throughout this opinion, Chokel's right to appraisal was preserved under G.L. c. 156B, Section 89; the Massachusetts court found that Chokel was entitled to an

appraisal of his First National stock; and this appraisal was required regardless of Merrill Lynch's accidental redemption of the twenty-eight thousand shares originally held on Chokel's behalf. First National would have been involved in the Massachusetts action, and a value would have been imposed upon the shares owned by Chokel, even if the original twenty-eight thousand shares were still held for him. Moreover, the court valued the 16,897 shares held by Merrill Lynch and Philadep for Chokel and acknowledged that Merrill Lynch assumed responsibility for reimbursing Chokel for the remaining eleven thousand three shares. First National was not "damaged" beyond the valuation of Chokel's shares. It fails to prove the nature and extent of injuries and that Merrill Lynch caused them. *Wing; Gaines, supra.* We, therefore, fail to find any damages caused by Merrill Lynch's "cover up" in relationship to the Massachusetts action.

First National's assignments of error are overruled.

*Judgment affirmed.*

NAHRA, C.J., and WEAVER, J., concur.